16r6bioc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    BIOSIG INSTRUMENTS, INC.,

4                    Plaintiff,

5            v.                              10 CV 7722(AKH)

6    NAUTILUS, INC.,

7                    Defendant.

8    ------------------------------x
                                     New York, N.Y.
9                                    June 27, 2011
                                     3:00 p.m.
10
     Before:
11
                     HON. ALVIN K. HELLERSTEIN,
12
                                          District Judge
13
                              APPEARANCES
14
     BARROWAY TAPAZ
15       Attorneys for Plaintiff
     BY:  PAUL MILCETIC
16
     HPM& B
17       Attorneys for Plaintiff
     BY:  JOHN H. BONE
18
     KLARQUIST SPARKMAN, LLP
19       Attorneys for Defendant
     BY:  JAMES GERINGER
20
     JOHNSON GALLAGHER MAGLIERY, LLC
21       Attorneys for Defendant
     BY:  JOSHUA M. SIVIN

22

23

24

25

               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

16r6bioc

1          (In open court; case called)

2          THE DEPUTY CLERK:  Counsel, state your appearances for

3    the record.

4          MR. MILCETIC:  Paul Milcetic of Barroway Topaz on

5    behalf of the plaintiff Biosig.

6          MR. BONE:  John Bone on behalf of Biosig.

7          THE COURT:  Who is going to be speaking?

8          MR. MILCETIC:  Paul Milcetic, your Honor.

9          MR. GERINGER:  Jim Geringer from Klarquest Sparkman

10   for Nautilus, your Honor.  I will be speaking.

11         MR. SIVIN:  Joshua M. Sivin from Johnson Gallagher

12   Magliery for Nautilus, your Honor.

13         THE COURT:  So I asked for this as a tutorial to help

14   prepare me for a Markman hearing that will be coming up in a

15   few days.  I thank counsel for coming in on short notice and I

16   am at your disposal.  I guess Biosig should go first.

17         MR. MILCETIC:  Your Honor, before I start -- this is

18   Paul Milcetic again on behalf of Biosig -- maybe I should ask

19   your Honor what you are looking for.

20         THE COURT:  Stand up first of all.

21         MR. MILCETIC:  Thank you.

22         THE COURT:  Bring the microphone closer to you.

23         MR. MILCETIC:  All right.  Will do.  Should I ask?

24         THE COURT:  I would like to hear you explain the

25   patent and complain what you think is the novelty of the

16r6bioc

1  patent, why it is worth a patent, and then outline for me some

2  of the terms in the claim that you think will need to be

3  discussed.

4          MR. MILCETIC:  Very good, your Honor.  So why don't we

5  go through the PowerPoint presentation that we put together.

6  So the '753 patent is the patent that is at issue in this case.

7  It relates to determining accurate heart rate and displaying

8  accurate heart rate on an exercise bike or exercise machine.

9  It can be a StairMaster or bicycle or some type of exercise

10  equipment.  It is actually the type of technology that you

11  probably have seen if you go to the gym, such as a treadmill,

12  where you put your hands on the bar and the bar shows you what

13  your heart rate is while you are running or exercising at the

14  time.  The novelty of this particular patent is that it not

15  only determines your heart rate, but it does so in a way that

16  is accurate.  Particularly the accuracy comes from the fact

17  when you put your hands on the bar, your muscle contracts.  How

18  strongly you squeeze the bar or hold the bar may affect the

19  heart rate calculation.  At least that was the problem with the

20  prior art.  What this patent addresses is determining your

21  heart rate while you're on the exercise bike and doing so in a

22  way that is accurate so that irrespective of how hard you

23  squeeze or how hard your muscles contract, you're going to

24  display an accurate heart rate.

25          So let's go through the claim.  There is only one

16r6bioc

1    independent claim in this patent.  So a heart rate monitor for

2    use by a user in association with an exercise apparatus.  It is

3    there you see on the third slide that you got a bar across the

4    exercise bike and you have a display, which will display your

5    heart rate.  You are going to put your hand in between those

6    two electrodes on either side of the handlebar and it will

7    determine your heart rate.  I don't think there is an issue as

8    to this particular phrase, heart rate monitor for your use by

9    user.  So the first phrase of the only independent claim in the

10   patent, which is where the parties have focused in terms of

11   what they are asking your Honor to construe is a heart rate

12   monitor for use is the preamble and it is the heart rate

13   monitor for use by a user that will read from the patent claim

14   in association with exercise apparatus and/or exercise

15   procedures.  I don't think the parties have any dispute,

16   although defendants will have a chance to speak.  I don't think

17   there is any dispute as to whether that preamble is included in

18   accused Nautilus products.

19          The next slide, an elongate member.  So that is the

20   bar or the bar that is across the front of the exercise machine

21   that measures your heart rate and displays your heart rate.  I

22   don't believe that there is any dispute that there is an

23   elongate bar in the accused Nautilus products.

24          THE COURT:  So an elongate bar is simply a horizontal

25   bar?

16r6bioc

          MR. MILCETIC:  Or an elongated bar.  Actually in

Nautilus products it is more curved.  It is not just straight

or horizontal.

          THE COURT:  Elongated means stretched?

          MR. MILCETIC:  Stretched, agreed.

          The next element is electronic circuitry.  You are

getting this very quickly.  Electronic circuitry, including a

different amplifier, having a first input terminal and second

input terminal.  This is the circuitry that is within the

exercise machine and what it is designed to do is to filter out

the information that comes from how hard you squeeze the bar so

that all that is left over is the machine measuring your heart

rate.  That is done through an electrical circuit or signal

processing.  I don't believe there is any difference, that

there is any dispute about whether there is a different

amplifier to the accused product.  It is essentially a circuit

that adds or subtracts signals that are inputted into the

circuit.

          The next slide.  The next element is said elongate

member comprising the first half and second half.  So what that

requires is that there be two parts to this what you refer to

as an elongated bar, a stretched bar.  There is one part and

another part.  There is a part that you put one hand on, the

left hand, and there is another part that you put the right

hand on.

16r6bioc

1          THE COURT:  Therefore any differential can be

2  detected.

3          MR. MILCETIC:  Correct.

4          THE COURT:  Smart.

5          MR. MILCETIC:  Correct.

6          I don't believe there is a dispute, again Nautilus is

7  going to correct me perhaps, as to whether the elongate member

8  is in the accused product.  I believe that both sides agree on

9  that.

10         The next element is a first live electrode and a first

11 common electrode mounted on the first half in spaced

12 relationship with each other.  So what that is there are two

13 electrodes.  There is two materials that will pick up

14 electrical signals from your hand on the first half and the

15 same thing is true on the second half.  So you can see on that

16 screen.  What you do is put your hands in the middle of those

17 two electrodes and there is a spaced relationship, meaning

18 there is space in between.  What that space is designed to do

19 is through experimentation and through sort of trial and error

20 you can determine a way of spacing them in such a way so that

21 the amount that you squeeze and the amount that you use your

22 muscles won't affect the heart rate calculation.  So space

23 relationship just means there is a particular space in between

24 those two from our speculative.  I think there is a dispute

25 about this and you will hear from Nautilus on this.  There is a

16r6bioc

1   space in between those two electrodes that you put your left

2   hand on.  That is the first half.

3           The next slide is a second live electrode and the

4   second common electrode mounted on said second half in spaced

5   relationship with each other.  Same thing as the other side.

6   You put your right hand on the other side of the handle of the

7   bike and there is a spaced relationship between those two

8   electrodes as well.  Again, I think there a dispute between the

9   parties as to what spaced relationship requires.  From our

10  perspective, it is the plain meaning.  There is a particular

11  amount of space between the two that is designed to again to

12  prevent the amount that you squeeze from causing an error in

13  heart rate calculation.

14          The next slide first and second common electrodes

15  being connected to each other and to a point of common

16  potential.  So basically what this means is that the two

17  interelectrodes from a circuitry standpoint are connected to a

18  ground.  I don't think there is any dispute that that is in the

19  accused product.  Again, if there is a disagreement I am sure

20  you will hear about it.

21          The next one is that first live electrode being

22  connected to said first terminal of said different amplifier

23  and said second live electrode being connected to said second

24  terminal of said different amplifier.  So what this is doing is

25  you are connecting to an amplifier, to a circuit both the outer

16r6bioc

1    electrode that we talked about, one on the left and one on the

2    right, the outer electrodes, and what you are doing is you are

3    connecting it to a different amplifier which is essentially

4    adding these two signals together to make sure that they come

5    out to be zero and the reason you want to make them come out to

6    be zero when you are talking about the electromyogram signal is

7    that you want the parts of the signal that relate to how strong

8    you hold the handlebar to cancel out so that all that is left

9    is the part of the signal that measures your heart rate.  That

10   is basically the idea.  So you have a connection to this

11   particular circuit which adds and subtracts.  I don't think

12   there will be a dispute about that.

13           A display device disposed on said elongated member.

14   This is what shows your heart rate.  If you have a bar or

15   stretched out element, there is a display that shows what your

16   heart rate is essentially when you are exercising on the

17   machine.  That is what the display is.

18           So wherein said elongate member is held by said user

19   with one hand of the user on said first half contacting with

20   said first live electrode and said first common electrode.  So

21   when you hold it with your left hand, you are contacting both

22   electrodes on the left side.  Again, there is a space between

23   the two electrodes on the left side.  And said first common and

24   second -- first common electrode and with the other hand of the

25   user on said second half contacting said second live electrode

16r6bioc

1    which was a second common electrode.  So you do the same thing

2    on the other side.  I think there is a dispute here about this

3    issue.

4            So what we would say is this a system claim, this is

5    an apparatus claim which means that the function of that bar is

6    that you hold it in those places.  Again, if you don't

7    understand something just speak up.  But basically what we're

8    saying there are two electrodes on either side and hold it in

9    the middle.  That is what the function is.  What the defendants

10   I think are saying is that a person actually has to be holding

11   this, both sides, before there is infringement.  And the reason

12   we disagree with that is because this is an apparatus.  In

13   other words, the way that you patent an invention is you cover

14   the component and you talk about what is the function of these

15   components as opposed to saying that it is actually -- that

16   somebody actually has to be standing there before you infringe.

17   The reason I think the defendants are doing this is because

18   there is a part of the patent law, direct infringement versus

19   indirect infringement, where to show indirect infringement you

20   have to prove that you induced somebody to do this, whereas

21   direct infringement happens when you just make the seller use

22   the product.  If the Court interprets this in such a way that

23   someone has to be standing there there is no infringement until

24   someone is standing there, which means I think where the

25   defendants are going with this is to say, Well, there is no

16r6bioc

1    infringement until you induced, you caused somebody to do that

2    as opposed to what we would say is, Whenever you sell that

3    since the function is that people will put their hands there

4    whenever you sell that you infringe.  So I think that could be

5    a potential disagreement between the parties.

6              THE COURT:  Not necessarily in the definition.

7              MR. MILCETIC:  Well --

8              THE COURT:  We'll see.

9              MR. MILCETIC:  I think their definition is there is

10   somebody there actually holding basically.  But you are right

11   that there is no difference in terms of technical meanings or

12   anything along those lines.  Both parties agree that the point

13   is you stand there and hold it.

14             The next element is whereby a first electromyogram

15   signal will be detected between first --

16             THE COURT:  You are swallowing your words.

17             MR. MILCETIC:  I am sorry.

18             THE COURT:  The word you are missing, Jennifer, is

19   electromyogram.

20             MR. MILCETIC:  The next element is:  Whereby a first

21   electromyogram signal will be detected between said first live

22   electrode and said first common electrode and a second myogram

23   signal of substantially equal magnitude and phase to said first

24   electrode signal will be detected between said second live

25   electrode and said second common electrode.  What this is

16r6bioc

1    saying is you are holding your hands on both sides and in terms

2    of what electrical engineers call magnitude and phase, the

3    signal is essentially the same.  It is going to be the same

4    from the right and the same from the left in terms of magnitude

5    and phase.  What that means is when that signal goes through

6    the differential amplifier and it is substracted since both

7    numbers are the same, it is going to wind up zero more less

8    which means that the electromyogram signal, the signal that

9    refers to how strong you are holding that bar is not going to

10   impact.  It is not going to be noise that impacts the system's

11   calculation of your heart rate, which is the point of the

12   invention.

13          There are a couple of issues that the defendants have

14   raised here with this element?

15          THE COURT:  Let's not worry now so much about the

16   definitional -- I am trying to say cute words -- the

17   differential of the interpretation.

18          MR. MILCETIC:  Okay.

19          THE COURT:  The interpretive differential.

20          What you are doing now is you want to have some kind

21   of a measurement and build some kind of device capable of such

22   measurement to allow a person who is actively exercising

23   through some kind of gym machine to know what his heart rate is

24   and thereby not to allow it to go over a certain level

25   considered safe or appropriate exercise goal.  What you are

16r6bioc

1    doing is measuring the pulse rate that flows through the

2    members of the body and putting it into a machine.  But since

3    you are getting in general how people are different pulse rates

4    depending where you are putting a hand on a bar and between

5    both hands you have to figure out some way to detect the

6    differential and cancel it and the patent I assume is this

7    method of detecting the differential and cancelling it.

8            MR. MILCETIC:  I agree except that it is not a method.

9    It is a system of components but that is correct.  In patent

10   law we make a difference between methods and systems but that

11   is correct.

12           THE COURT:  So ultimately this claim has to teach

13   someone skilled in the trade to make something like that?

14           MR. MILCETIC:  Yes.

15           THE COURT:  If doesn't teach them how to do it, it is

16   not a good patent.  If it does and it meets the requirement of

17   novelty, it is a good patent.

18           MR. MILCETIC:  That is correct.  If it is novel and it

19   teaches one of ordinary skill in the art how to build one of

20   these things than it is a good patent.  If it doesn't meet the

21   requirements of 35, U.S.C., section 112 or 102 then it is not a

22   good patent.

23           THE COURT:  So now we can listen to your adversary.

24           MR. GERINGER:  Thank you, your Honor.  Jim Geringer

25   for Nautilus.  One point, if we can get my slide up, your Honor

16r6bioc

```
 1    just raised was if it enables.  Several years ago the first
 2    time this case was before the Court, my predecessor sought a
 3    summary judgment motion and they said it does not enable.
 4              THE COURT:  It what?
 5              MR. GERINGER:  You cannot get these equal signals.
 6              THE COURT:  Not what?
 7              MR. GERINGER:  Not enabled.  It will not teach
 8    somebody how to build this so that you can get these perfectly
 9    equal signals or so equal that they zero out because there is
10    chaos going on on the palms and the electric signals and
11    muscles and it is very hard to get equal.  That is what we
12    briefed and Biosig submitted an expert declaration that said
13    basically Dr. Galiana from McGill University in Toronto said I
14    gave Figures 1 and 2 of the patent to my graduate assistant and
15    he built it in two hours.
16              Now, on the screens here we see it is a really three
17    heart monitor devices, your Honor, because the patent needs to
18    be understood in context because of the reexamination they
19    distinguished the monitor that is on the right.  So the monitor
20    that is on the right has two electrodes just like two pairs of
21    two electrodes.
22              THE COURT:  Two things on the right, Figure 1.
23              MR. GERINGER:  Figure 1, we call it Fujisaki.  This is
24    much earlier, more than a decade before the patent is filed.
25    And he has two electrodes on a bar with a space in between.
```

16r6bioc

Two of those electrodes are live going to a dif amp and two of
those electrodes go to the ground.  It is wired and built just
like the basics of what was just described.

         Now, the next slide, your Honor, is what they told
this Court demonstrated the invention and they built it and
they told the Court, Here is what my grad student can put
together in two hours.  And those gold bands there, the cooper
bands, those are those electrodes, on the left and on the
right.  Each has a pair and on the left and the right each goes
to -- one signal goes to the end of the dif amp and one signal
goes into the -- the differential amplifier, I am sorry, your
Honor.  I will start over.

         THE COURT:  The dif amp is the differential amplifier?

         MR. GERINGER:  Yes.

         THE COURT:  "Dif" meaning differential?

         MR. GERINGER:  Yes.

         THE COURT:  What is the differential, between what and
what?

         MR. GERINGER:  It is the different between the heart
signal, because the heart signal is on your left side your body
so it has a different polarity.  I can describe it to your
Honor in this way:  What a differential amplifier would do is
take the -- I have the definition right here on the screen --
it will amplify the difference.  That is why we call it a
differential amplifier.

16r6bioc

1          So a heart signal has a asymmetry to it, left and

2     right.  You will have opposite polarities on each side.  So Dif

3     amp will take that difference and add it.  So if I had

4     Dr. Galiana, as an example, for Biosig back then I have signal

5     one M 1 plus noise.  Signal 2, M 2 plus noise.  M 1 is the

6     opposite of M 2.  So the dif amp adds M 1 and M 2, subtacks M

7     minus M.  The concept is add things that are different,

8     subtract things that are the same.  If muscle is the same on

9     each side, it gets subtracted out.  The heart being different

10    on each side, gets added up.  So this weak heart signal that

11    filers out to the hands, it gets amplified because it is

12    different on each palm, and the muscle signals, which are

13    theoretically according to the claim, the same on each side

14    gets subtracted at zero.

15          But before you think I am arguing for plaintiffs, I

16    want to return to this point:  They said when first sued Biosig

17    said, This is easy to build.  Nautilus says you cannot build

18    it.  We did in two hours.  Look how they built it.  They took a

19    fat strips of cooper narrowly separated and put them on a metal

20    dowel.

21          THE COURT:  Is this what I have to deal with in the

22    Markman hearing.?

23          MR. GERINGER:  Yes.  Because in the reexamination

24    hearing, in the reexamination process, we showed that first

25    Fujisaki monitored the Patent Office.  As you can see, your

16r6bioc

1    Honor, it is very similar.  It has two pairs of electrodes, two

2    going to a dif amp, two go to ground.  So it does the same

3    thing and that patent, which is presumed valid, same

4    presumption that their patent gets, that patent describes why.

5         I will be happy to hand this up.  It is the Fujisaki

6    patent.  Each of the grips composed of two cylindrical

7    electrodes.  The electrical circuit includes a differential

8    amplify having input from those grip centers for amplifying the

9    difference between the heart pulse and when a person grips the

10   left and right hand grips, preferably the palms covering the

11   sensors, you filter out, it says, AC hum and human body hum.

12   Those are noises.  If you are standing on the machine and it is

13   plugged in, there is a 60 Hz cycle from being plugged in.

14   Well, that will come through both left and right through the

15   exerciser.  It gets canceled out in the dif amp.

16        The heart remembers what you are trying to amplify,

17   the muscles are trying to subtract.  That Fujisaki did the same

18   thing the same way and when they got to reexam, your Honor,

19   they had to distinguish it.  When they distinguished it, they

20   threw the baby out with the bath water because they

21   distinguished their--

22        THE COURT:  Mr. Geringer, I am sure at some point I am

23   going to be listening to this.  It is not going to help you at

24   the Markman hearing.  Skip it.

25        MR. GERINGER:  I understand, your Honor.  If your

16r6bioc

1   Honor would like me to skip --

2          THE COURT:  You are telling me about the prior art.  I

3   already know about the prior art.

4          MR. GERINGER:  Your Honor, the only reason I think --

5          THE COURT:  Before Biosig came around with its

6   machine, if I was riding on an exercise bike and put both hands

7   down, could there be a monitor?

8          MR. GERINGER:  Yes.

9          THE COURT:  What is novel claims for this?  What

10  according to the claim is novel?  Forget whether or not the

11  claim can stand up.  What does the claim say about itself as a

12  novelty?

13         MR. GERINGER:  As articulated in the reexam, your

14  Honor, what is novel is that it has prebalancing so that any

15  one can grip it with any kind of squeezing and it will always

16  stay balanced.  It is prebalanced.  That is what they said.

17  The configuration of these electrodes is what they said the

18  heart of the invention.  They call that the present inventive

19  concept.  This preconfiguration balancing these electrodes so

20  you always get that cancelling.  That is what they said was

21  novel.  They said it wasn't in that piece of prior art because

22  the reexam is all about describing how you are novel over this

23  prior art.  So I have from both sides, if I understand what

24  goes on, a chart, the claim language that is to be construed is

25  set out on the left, the precise words for construction being

16r6bioc

 1    in bold, otherwise the rest of the sentence is in plain type,

 2    and then I have the proposed construction by Nautilus and then

 3    the proposed construction by Biosig.

 4            Have you folks gotten together to see if you can come

 5    to agreement on some of these disputes?

 6            MR. GERINGER:  We continue to constantly discuss this,

 7    your Honor.  We've come to a lot of agreement and we'll

 8    continue discussing it.  We have a good relationship with

 9    plaintiff's counsel in the sense that while we disagree on the

10    conclusions, we're trying to reach as much agreement as

11    possible.

12            MR. MILCETIC:  Your Honor, I personally agreed on

13    this.  Maybe we can set a date.  After this we just can't agree

14    on anything further.  Maybe that makes sense.

15            THE COURT:  When is the Markman hearing.

16            MR. GERINGER:  July 5th.  My conversations were

17    primarily with Mr. Milcetic's co-counsel, his colleagues.  We

18    think we reached as much agreement as we can.  One can see, for

19    example, in the black square boxes, we think those are the most

20    critical areas of disagreement.  On the left there are some

21    terms that are in boxes.

22            MR. MILCETIC:  I think it is worth one week to confer

23    and try to narrow our differences if we can.

24            MR. GERINGER:  We would be happy to do that.

25            THE COURT:  There is a certain time when it is not

16r6bioc

1    productive.  But, for example, looking at a differential

2    amplifier and the agreed language is rotten stilted, you can do

3    better.  You are not writing for a patent examiner; you are

4    writing for me.  I am not a patent lawyer.  I know that

5    differential amplifiers are on the market.

6         MR. GERINGER:  May I ask, your Honor, if what is up on

7    the slide now is the English definition for the first line,

8    first bullet point only.

9         THE COURT:  It seemed to be the way to define it.  A

10   differential amplifier modifies and amplifies the difference

11   between two signals.

12        MR. MILCETIC:  Yes.

13        MR. GERINGER:  The parties agree on that.

14        MR. MILCETIC:  Yes.

15        MR. GERINGER:  We'll incorporate that, your Honor.

16        Your Honor, the first blacked box really is where the

17   rubber starts meeting the road and we're not trying to do the

18   Markman hearing today I know, but as far as tutorial goes any

19   explanation of why spaced relationship might matter, why -- in

20   some of my slides, your Honor, I was ready and willing to go

21   through the idea of how the heart wave, what the heart wave

22   looks like and what is being detected here and how you

23   calculate the pulse.

24        THE COURT:  That is worthwhile.

25        MR. GERINGER:  May I?  If we start on this slide, your

16r6bioc

Honor, this is a page from Biosig's expert report so I propose

it --

       THE COURT:  Before you do is that, looking at this

spaced relationship.

       MR. GERINGER:  Yes.

       THE COURT:  There is no problem with live electrode.

No problem with common electrode.

       MR. GERINGER:  Yes, your Honor.

       THE COURT:  Speak too quickly.  The two common

electrodes are connected to each other and to a point of common

potential such as ground.  What does common potential mean?

       MR. GERINGER:  Same chart, your Honor.  So, for

example, if both Mr. Milcetic and I touch the same person, we

have a common potential with static electricity.  We might be

given a shock at first but at that point we both have common

potential.  It is not necessarily true ground if we both

touched the same thing then it is the common thing that gives

us the common potential.

       Would you agree, Mr. Milcetic?

       MR. MILCETIC:  Yes.

       MR. GERINGER:  Ground is zero, zero, zero.  So we all

know when we jump a car battery or work on electricity, you

want to make sure what ground is.

       THE COURT:  So it is a point of common preference?

       MR. GERINGER:  Yes, your Honor.

16r6bioc

1          So the next thing, spaced relationship, what is going

2    to happen in the briefing is the parties are going to focus a

3    lot on what was said in the reexam about spaced relationship.

4    But returning to how this works, your Honor, up on the screen I

5    have the heart wave.

6          THE COURT:  Yes.

7          MR. GERINGER:  So what is being measured here isn't

8    actually blood pressure. If you take your pulse at your wrist,

9    you are actually feeling fluid flow.  You are feeling pressure

10   that comes out from the heart.  A little before that fluid flow

11   there is an electric pulse.  It has this shape and they call it

12   the PQRST for characteristics of this shape.  What these heart

13   rate monitors are trying to do when they measure the electric

14   pulses is trying to catch that R wave.  They are trying to

15   catch it because if you have one R wave every second, you would

16   have 60 beats a minute and your pulse would be 60.  If you had

17   two per second, it would be 120, hopefully actively exercising

18   at that point.

19          This is just a blowup of that, what they call QRS

20   complex.  Nothing here needs to be understood to deep level of

21   technical detail because the parties both agree we're trying to

22   pick out the R wave.  Now, the heart wave, and we can think of

23   the fancy word, ECG, the heart wave is timed as I said by the

24   number of beats per minute and this again from their -- this is

25   not from their report.  It is from a book earlier, 1988, that

16r6bioc

1  describes a lot of different ways of calculating heart wave.

2  This is one divided by 60.

3           Now, muscle noise is represented here in red and if

4  you see that R wave now, it looks kind of hidden, again this is

5  from Biosig's expert report.  I only present it so we're all on

6  the same page.  The idea here behind the patent and what is

7  behind Fujisaki and the reexam we discussed a lot is how do we

8  flush that R wave out.

9           THE COURT:  So if you take your pulse at the wrist

10 where the vein comes very close to the skin, you can feel the

11 pulse?

12           MR. GERINGER:  Yes, your Honor.

13           THE COURT:  If you try to take it in your middle

14 finger, it is hard to find the pulse?

15           MR. GERINGER:  Correct, your Honor, but that is

16 pressure under that fluid flow.  There is something similar

17 about electronics, though.  Because electric signals have to

18 travel a long way from the heart to the fingers.  So if you

19 really wanted an accurate heartbeat electrically, you might put

20 it closer to the heart.  So part of the idea here, and this is

21 their commercial product, your Honor, is that you could grab it

22 and my heartbeat is way too high because I am in open court

23 arguing.  But live common or maybe it is live common, I don't

24 know how they wired these two, but if I have just one hand,

25 nothing.  One hand nothing.  Two hands, readout.

16r6bioc

1              Fujisaki worked we said the same.  So in the Markman

2      we're going to be talking not about disagreeing about the basic

3      way differential amplifier sorts this out.  We'll be talking

4      about this critical spaced relationship.  They said the spaced

5      relationship is critical.  Fujisaki will not work in all

6      conditions they said.  Our invention will because our intention

7      especially understands that spaced relationship.

8              THE COURT:  There is a lot of pressure on defining

9      spaced relationship.

10             MR. GERINGER:  Yes, your Honor.

11             THE COURT:  So the relationship defined by the

12     relationship between the measurement between one point and

13     another point.

14             MR. GERINGER:  We say so, your Honor.  Biosig will

15     have to answer.  I am looking for a big picture, but on the

16     parties' joint chart, page 2, I have a small excerpt of a

17     figure from the patent in which I show, yes, it is the width of

18     the band and the width of the gap in between and the reexam we

19     will argue that they said certain things.  I am not trying to

20     make the argument today.  I am saying there were arguments

21     about how far you space them and how fat you make the

22     electrodes.  Also, are they going to be rings?  Are they going

23     to be plates?  You might go to a gym, see a machine, it doesn't

24     have rings, it might just have plates.  I will show your Honor

25     an example of an accused product.

16r6bioc

1           Again, this is not for construction, your Honor.  It

2    is merely for you to understand what the parties are disputing.

3    The picture up on the screen is --

4           THE COURT:  Biosig wants to talk not about lineal

5    relationship but a geometric relationship.  So, Mr. Milcetic,

6    why should geometric be introduced here if it is not in the

7    claim itself?

8           MR. MILCETIC:  Geometric should be introduced --

9           THE COURT:  It means geometric relationship.

10          MR. MILCETIC:  We're trying to say the plain meaning

11   here.

12          THE COURT:  But geometric is not part of the plain

13   meaning of the claim so why do you want to add that word?

14          MR. MILCETIC:  We don't have to.

15          THE COURT:  I can think of at least two relationships.

16   Maybe there are more.  There is a lineal relationship and there

17   is a geometric relationship.

18          MR. MILCETIC:  I think when we said geometric we were

19   just thinking space from algebra, axis and in space.  There is

20   a spacial relationship between two electrodes.  That is all.

21          THE COURT:  Why is it geometric rather than lineal?

22   There is also a measurement putting a straight line to a curved

23   line.

24          MR. MILCETIC:  Yeah.  Well, I think lineal is okay.  I

25   don't think we have a problem with that.  Our position is

16r6bioc

1     basically the plain meaning.

2              THE COURT:  So what you want to say is space

3     relationship is a relationship according to a measured distance

4     between two points.

5              MR. MILCETIC:  That's fine with us.

6              MR. GERINGER:  That's also fine for Nautilus, your

7     Honor.

8              THE COURT:  That is much simpler.

9              MR. GERINGER:  To be clear, your Honor, it is the

10    width of the pass and the width of the space between them and

11    the width, just to use this as an example, the width of an

12    electrode and space between.

13             THE COURT:  So it is a relationship measured according

14    to distance between two points?

15             MR. GERINGER:  Yes, your Honor.

16             MR. MILCETIC:  That's exactly correct.

17             THE COURT:  That's a spaced relationship.  So the live

18    electrode, the first live electrode and first common electrode

19    have a certain distance between them and the second live and

20    second common electrodes have another distance between them.

21             MR. GERINGER:  Correct, your Honor.  That can be

22    symmetrical or not.

23             THE COURT:  We don't know.

24             MR. GERINGER:  Correct.

25             THE COURT:  So that will be the definition.

16r6bioc

1              MR. GERINGER:  That's fine, your Honor.

2              MR. MILCETIC:  That is fine with Biosig, your Honor.

3              MR. GERINGER:  Your Honor, if I may move to another

4       simple term.  On page 4 of the parties' chart it says, Where --

5              THE COURT:  I don't have it.

6              MR. GERINGER:  There is a footer in very small print.

7              THE COURT:  Got it.

8              MR. GERINGER:  It says, Where elongate member is held,

9       here we really should be able to come to agreement, but there

10      is a disagreement underlying it.  Everyone seems to want to say

11      held is held.  If you made contact, you are holding it.  The

12      reexam is going on and on about what kind of hold?  Are you

13      gripping?  Are you relaxed?  Are you tight?

14             THE COURT:  There is nothing in the claim that talks

15      about that.

16             MR. GERINGER:  We certainly agree with that, your

17      Honor.

18             THE COURT:  It is held enough so you can make a

19      measurment.  So we have elongate member.

20             MR. GERINGER:  A lengthened member, a stretched out

21      member I believe your Honor suggested.  Stretched out.

22             MR. MILCETIC:  That would be fine with Biosig, your

23      Honor.

24             THE COURT:  Such as a rod?

25             MR. GERINGER:  Correct, your Honor.  To be clear in

16r6bioc

1    the prior case they sued Kliner bikes which had --

2            THE COURT:  What this a prior case?

3            MR. GERINGER:  Your Honor, this suit was originally

4    filed in 2004 and it was before your Honor.  There was some

5    motion practice and then we found the Fujisaki patent.  We went

6    to the Patent Office and said, Please reexam it.  And when they

7    said they would, we came to your Honor jointly and said, Will

8    your Honor please stay the Biosig v. Nautilus case pending the

9    Patent Office reexamination.  Your Honor said, I will not stay

10   it, but I will dismiss it and let you toll statute of

11   limitations.  So that is what the parties did.  We considered

12   this Biosig two.  And when I say the prior case, I mean that

13   Biosig one case.

14           THE COURT:  It is a case which I received from Judge

15   Owen.  Let's go back to the elongate member.

16           MR. GERINGER:  So that is a long member.  It would not

17   be -- for example, we had previously been accused of like you

18   sit back on these recliner bikes in a gym, if I had electrodes

19   on both arms of my chair, I wouldn't call that on the same

20   elongate member, but my understanding is that is no longer

21   being accused so I don't think we'll have --

22           THE COURT:  So it is something like a situation where

23   the user puts his left hand on the left-hand side of electrodes

24   and his right on his right-hand side of the electrodes holding

25   each.

16r6bioc

1          MR. GERINGER:  That is the elongated member.

2          THE COURT:  That is what we'll do.  I think you folks

3     can give another try at this using the definitions here.

4          MR. GERINGER:  We'll do that.  Would you like us to

5     submit another joint chart?

6          THE COURT:  I would.

7          MR. GERINGER:  We'll do that before the hearing.

8          THE COURT:  Yes.

9          MR. GERINGER:  To confirm, your Honor, we asked for

10    two extra days for briefing.  I will be flying back tonight and

11    we're going to get into the briefing.

12         THE COURT:  We'll go off the record.

13         (Discussion off the record)

14         MR. GERINGER:  This accused product that I show on the

15    screen, it is very important that accused products are never

16    used to construe the claims.  That is true.  The Circuit has

17    been clear that you can take a peek to understand what the

18    parties are fighting about.  So, for example, these aren't

19    rings and you see how they are spaced.

20         THE COURT:  I am not helped by this.

21         MR. GERINGER:  Then let me go back to the chart and

22    look for another term to simplify, your Honor.

23         THE COURT:  There is a rod.  It doesn't make that rod

24    is broken by space or another object or whatever.

25         MR. GERINGER:  Elongated member is a good, clear

16r6bioc

1    example, your Honor.  We don't have a problem with that.  I

2    wouldn't dispute that.

3              THE COURT:  Let's go to page 5.

4              MR. GERINGER:  On page 5 the black box term is maybe

5    the most central term the parties will be debating.

6              THE COURT:  Let's be clear on electromyogram.  It is

7    an electrical signal produced by muscles other than the heart.

8              MR. GERINGER:  Yes.

9              THE COURT:  Electrocardiograph is an electrical signal

10   produced by the heart.

11             MR. GERINGER:  Yes, your Honor.

12             THE COURT:  So what this patent has to do is take a

13   differential of one from another, am I right?

14             MR. GERINGER:  Charge is important.  Muscle has same

15   chargeable signs, heart opposite.  The differential amplifier

16   will subtract the same charges but add opposite charges.  So

17   the heart is special because the heart is not symmetric.  The

18   heart is on the left.  And just the way biology works, they say

19   opposite polarity.  So I don't get equal heart signals in my

20   right and left hand.  The other muscles, they say they will

21   detect equal heart signals.  That is what this claim is about.

22             THE COURT:  What the biology, one ventricle is

23   positive and another is negative?

24             MR. GERINGER:  I think it is because it is on the

25   left.  Do you know?

16r6bioc

1          MR. MILCETIC:  I think that is right.

2          MR. GERINGER:  I think it is the asymmetry of the

3    body.  If I had somebody with a heart rate in the middle, in

4    theory I wouldn't set up those competing electric fields.  Like

5    I think if I squeezed one hand, that is not symmetric now

6    either.

7          THE COURT:  So is it an oscillating value?

8          MR. GERINGER:  I think so.  This wave we showed, let

9    me show a closeup.  This is the closeup.

10          THE COURT:  Yes.

11          MR. GERINGER:  That is the same wave now six times.

12    So this is this complex wave six times.

13          THE COURT:  If you look at the line across, some

14    values are above and some are below.

15          MR. GERINGER:  I don't know why that is.  I don't know

16    that is a zero axis, your Honor.  It certainly is showing you

17    that chart that similar things are going up and things are

18    going down.  The electric charge flowing out of the heart is a

19    rollercoaster ride and that is up and down.

20          THE COURT:  In other words, what you are saying though

21    is that since the signal of the heart is plus and minus and the

22    signal of the muscles is plus and steady, you take an average

23    of the muscle signal and you add the heart signal and you

24    subtract the average against the sum.

25          MR. GERINGER:  Can I try that?

16r6bioc

1          THE COURT:  Yes.  It not very good.

2          MR. GERINGER:  Let me try it.  What is happening is

3    you are taking the heart signal as it is detected in the palms

4    and because that is going to be opposite polarity is the word

5    but opposite charge, it will get added.  Opposite charge

6    signals will be added because muscle of the same charge, they

7    will be substracted if they are the same.  Anything similar,

8    anything that is the same will be substracted.  Anything that

9    is different will be added.

10          See, that is key because, for example, when Biosig was

11   explaining before they kept saying, while exercising, while

12   exercising.  We don't know frankly why they leave in the "while

13   exercising" in this claim.  But while exercising there is a lot

14   of activity in the hands and people's hands can move.  So

15   assuming equality, assuming identity between those two hands,

16   muscle signals, is an assumption.

17          Nature doesn't mandate that.  Nature mandates that

18   your heart will have opposite polarities.  Nature doesn't

19   mandate that your hands are given off equal signals.  And in

20   the first case, in fact there was a motion brought saying you

21   can't ever find really equal signals because there is too much

22   chaos going on, and the parties will debate that.

23          THE COURT:  Okay.

24          MR. MILCETIC:  Your Honor, you can jump in, but the

25   differential amplifier recently subtracts.  It basically

16r6bioc

1    subtracts.  So if you have two positive numbers, five and five,

2    and you subtract that is your muscle signal.  Five minus five

3    is zero.  That is what the claim says you want.  You want the

4    muscle squeezing and the effect of the muscle signal to have no

5    impact on the heart rate calculation.  As he pointed out, the

6    cardiac signal because it is opposite, because it is a negative

7    five and a five were not subtracted which would give it

8    negative 10.

9           MR. GERINGER:  Positive 10.

10          MR. MILCETIC:  So it is amplified.  The point is it is

11   not zero, which is what you want.  You want the cardiac signal,

12   your pulse rate, to be determined without that noise that comes

13   from the muscle signal.  That is essentially what he is talking

14   about.

15          MR. GERINGER:  So, your Honor, not to pretend to be

16   scientifically accurate here but to give you the sense of the

17   scale, the muscle might be five on a scale of like five and the

18   heart might be on a scale of point five.  So point five minus

19   negative point five, I am up to one.  Five minus five, I am

20   down to zero.  Suddenly point five stands out whereas before

21   the five is passing.

22          This term that is in the square box here, the

23   "whereby," basically comes down and says two equal muscle

24   signals will be detected at the differential amplifier at the

25   input.  In the diagram here that comes from the patent, the

16r6bioc

1   diagram below, it shows the boxes and the drawing on the

2   bottom, Figure II, the boxes at the top, No. 9, 11, 15 and 13,

3   those correspond to the electrodes shown in this commercial

4   embodiment in my hand.  So 9 and 13 --

5          THE COURT:  Equality is not part of the claim.

6          MR. GERINGER:  It is part of the claim.

7          THE COURT:  Oh, it is.

8          MR. GERINGER:  It is in this element.

9          MR. MILCETIC:  It is.

10          MR. GERINGER:  It says substantially equal magnitude

11  and phase.

12          THE COURT:  That is a phenomena of the human body.  It

13  is not produced by the intention.  It is produced by natural --

14          MR. GERINGER:  Yes, your Honor.  They are trying to

15  detect the equal signals from the human body.  Not create them,

16  detect them.

17          THE COURT:  Okay.

18          MR. GERINGER:  Your Honor, magnitude and phase, would

19  your Honor like us to explain?

20          THE COURT:  Yes.

21          MR. GERINGER:  Magnitude size.  Phase, if your Honor

22  remembers, sign waves or cosign waves, a phase, if I am not at

23  the ocean, I am at Jones Beach and a see a wave come from troth

24  to troth, that is a period from peak to peak.  That is a

25  period.  So phase if two waves are in the same phase, they

16r6bioc

1    build each other one.  If two waves are sign and postsign out

2    of phase, they kind of cancel each other down.  Remember that

3    minus the negative turns into a positive.  If my muscle signals

4    are out of phase, they don't cancel out.  They add up.  Big

5    noise becomes bigger noise.  So phase is very important for the

6    cancelling.

7           Anything else on the whereby two equal signals

8    element?

9           THE COURT:  No.  When you have the agreed boxes is

10   that all that I need for the definition, or is it only part?

11          MR. GERINGER:  It is only part, your Honor. it is the

12   agreed part, your Honor.  Generally though we segregated out a

13   term that we can agree on entirely.

14          THE COURT:  I think you folks can do better.  Get your

15   same definition into the unagreed part.

16          MR. MILCETIC:  We'll work on it, yes.

17          THE COURT:  Let me give you my philosophy of the

18   Markman.  It is to help me decide the real issues.  It is not

19   to get an advance from one side or the other.  The most

20   successful Markman hearing will be to interpret the patent in a

21   simplified way to give each of you room to make your arguments

22   on the substance.  So I am not looking to give either side an

23   edge.  I am not looking to make a dispositive ruling on the

24   claim either.  That will come in the next phase.  A successful

25   Markman hearing will make all our lives simpler.

16r6bioc

1          MR. GERINGER:  Thank you, your Honor.

2          THE COURT:  I think that is really important.

3          MR. GERINGER:  Yes.  Let me presage how simple what we

4  think we will be arguing.  We think it is as simple lineal

5  spaced relationship that they say -- sorry.  If you look at the

6  figure that is up there, they say the electrodes have to be

7  thinner than the gap between.  They say that doesn't have to be

8  the case.  That is the perfect example.  Nautilus will say,

9  There has to be a fat middle part, the spacing between has to

10  be fatter than the actual electrode width and Biosig will say,

11  No such limitations or can be any spaced relationship.

12          THE COURT:  If it helps you can also add a simple

13  contention to the definition so it becomes clear what you each

14  argue substantively.

15          MR. MILCETIC:  That's fine.

16          THE COURT:  That will also help the definition.  The

17  goal is not to have a fight over the definition.  The goal is

18  to make it as simple and clear as possible.

19          MR. MILCETIC:  We would be fine with your Honor's

20  definition, which is the distance between two points.

21          THE COURT:  So we've already accomplished that.

22          Now we're stuck with electromyogram signal

23  electromechanical signal.  If we are talking about

24  electromyogram it is the signal from the heart.  What is

25  electomechanics?

16r6bioc

1          MR. MILCETIC:  Myogram is the muscle signal.

2          THE COURT:  Reversed.

3          MR. MILCETIC:  Cardiogram is the heart.

4          THE COURT:  What you want to do is measure each

5     dampening the effects of muscle signals and accentuating the

6     effects of the heart signals in order to make a clear

7     differential meaning.

8          MR. GERINGER:  Yes, your Honor.  Dampen the muscle,

9     accentuate the heart.

10          MR. MILCETIC:  Both parties agree on that.

11          MR. GERINGER:  May I make a point?

12          THE COURT:  Yes.

13          MR. GERINGER:  There are a lot of ways to calculate a

14     heart signal, a lot of ways to get a heart signal, a lot of

15     ways to do it with a differential amplifier.  We are going to

16     be arguing that they do it in a specific way and when they

17     distinguish other devices that had two pairs of electrodes and

18     differential amplifier to dampen the muscle and accentuate the

19     heart, they said, ah, but we do it in a different way.  So it

20     is not just dampening the muscle and accentuating the heart, it

21     is whether we will contend that they said they do that in this

22     particular way.

23          THE COURT:  So there has to be something in the claim

24     that says that?

25          MR. GERINGER:  Yes, your Honor, or in the file

16r6bioc

1   history.  Because of course a patentee can clarify what they

2   mean in the file history.

3          A very important thing will happen here, your Honor.

4   If during the reexam they change the scope of the claim, they

5   didn't change any of the literal world, they changed the scope,

6   13 years of alleged damages and discovery will disappear.  They

7   filed in 2004, six-year statute of limitations.  They were

8   claiming damages from 1998.  If in reexam the patentee is

9   forced to change the substance of the claim if it is not

10  substantially identical when it gets out, everything before the

11  reissue disappears.

12         THE COURT:  I don't know where that comes in in the

13  Markman hearing.

14         MR. GERINGER:  Because as a matter of law you are also

15  looking at the claim before.

16         THE COURT:  What you want to do is part of the

17  definitions is no note the change, if any, but there will be a

18  lot of tension in that?

19         MR. GERINGER:  Yes, your Honor.  Each of the black

20  squared boxes is changed, your Honor we contend obviously.  We

21  respect the fact that Biosig disagrees.

22         THE COURT:  It would be useful to note that, the

23  respective intentions of the parties.  That is going to be the

24  next step.

25         MR. GERINGER:  We'll meet and confer and try to work

16r6bioc

1    out contentions.

2         THE COURT:  We can accommodate you July 27th at

3    10:30 a.m. or July 28 at 2:30.

4         MR. MILCETIC:  Either one of those dates are fine with

5    Biosig.

6         THE COURT:  July 27th.

7         MR. GERINGER:  Okay, your Honor.  Shall we submit

8    written --

9         THE COURT:  July 27 at 10:30.

10        MR. GERINGER:  27th?

11        THE COURT:  July 27th, 10:30.

12        MR. GERINGER:  Yes.  Shall we make written submissions

13   on the 20th?

14        THE COURT:  Yes.

15        MR. MILCETIC:  That's fine.

16        MR. GERINGER:  Those written submissions, your Honor,

17   would you like if we are able to get an approved chart to your

18   Honor --

19        THE COURT:  Yes.  Or even a little later.  Are we

20   going to have joint submissions?

21        MR. GERINGER:  The chart will be joint again, your

22   Honor.

23        THE COURT:  How about your submissions?

24        MR. GERINGER:  The 10 pages each was going to be --

25        MR. MILCETIC:  Argument.

16r6bioc

1          THE COURT:  So you want to do it at the same time?

2          MR. GERINGER:  That's a good idea because it is

3  basically the contentions that we put in the chart.

4          MR. MILCETIC:  So one date for making those

5  submissions and a subsequent date for opposition and responses.

6          MR. GERINGER:  That will be fine.

7          THE COURT:  And the second one should be short.  I

8  think we have gone enough.

9          MR. GERINGER:  Yes, your Honor.

10          THE COURT:  Very good.  We did this once earlier.

11          MR. GERINGER:  Your Honor, may I propose July 13th

12  original submissions and rebuttal on the 20th?

13          THE COURT:  Yes.

14          MR. GERINGER:  10 pages for originals and five or less

15  for replies.

16          THE COURT:  Excellent.  But don't play around with

17  five.

18          MR. GERINGER:  You mean if I say five, I better mean

19  five?

20          THE COURT:  Yes.  Don't play around with margins.  The

21  Second Circuit is 14.5, but 12 is okay.

22          MR. GERINGER:  My prior experience is that if I

23  haven't made my point in 10 pages, I am having a bigger problem

24  than the length of my brief.

25          THE COURT:  Right.

16r6bioc

1            MR. MILCETIC:  To be clear, your Honor, on behalf of

2     Biosig, I think we'll be submitting a joint appendix as well.

3            MR. GERINGER:  Yes, your Honor.  We apologize in

4     advance, file histories is 800 pages.

5            THE COURT:  It is not my first patent case.  You can

6     use an appendix that is abbreviated.  That is good.

7            MR. GERINGER:  That would be very possible, your

8     Honor, because much of the appendix will not be at issue.  We

9     can submit an abbreviated one and we'll agree on that with

10    Biosig and get it down to a couple hundred pages, which is

11    brief for this.

12           THE COURT:  Good.

13           MR. GERINGER:  Anything else, your Honor?

14           THE COURT:  Have a good 4th of July.

15           MR. MILCETIC:  Thank you, your Honor.

16           MR. GERINGER:  Thank you, your Honor.

17                              o0o

18

19

20

21

22

23

24

25